FILED

JAN 0 4 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DAWN MARIE STOKES,
Plaintiff,

CV 09-1264-PK

FINDINGS AND
RECOMMENDATION

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,
Defendant.

PAPAK, Magistrate Judge:

Plaintiff Dawn Stokes filed this action on October 27, 2009, seeking judicial review of a

final decision of the Commissioner of Social Security denying her application for supplemental

security income ("SSI") under Title XVI of the Social Security Act (the "Act"). This court has

jurisdiction over Stokes' action pursuant to 42 U.S.C. §1383(c). Stokes' primary argument is

that the ALJ improperly found that Stokes did not meet Social Security Listing 12.05C for mental

retardation. Stokes also contends that the ALJ improperly assessed her residual functional

Page 1 - FINDINGS AND RECOMMENDATION

capacity and improperly evaluated lay witness evidence. I have considered all of the parties'
briefs and all of the evidence in the administrative record. For the reasons set forth below, the
Commissioner's decision should be reversed and remanded for calculation and award of benefits.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must
demonstrate an "inability to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected . . . to last for a continuous
period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has
established a five-step sequential process for determining whether a claimant has made the
requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R.
416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only
at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v.
Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if
any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 416.920(a)(4)(i). If the ALJ finds that the
claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See
Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b). Otherwise, the
evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments.
*See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §416.920(a)(4)(ii). An impairment is
"severe" if it significantly limits the claimant's ability to perform basic work activities and is

expected to persist for a period of twelve months or longer.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(c).  The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.921(b); *see also Bowen*, 482 U.S. at 141.  If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).  If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record.  *See* 20 C.F.R. § 416.920(e).  The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments.  *See* 20 C.F.R. §416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

Page 3 - FINDINGS AND RECOMMENDATION

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level. 20 C.F.R. § 404, Subpt. P, App. 2. The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made. In the event the grids do not mandate a finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets his burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g).

//

**LEGAL STANDARD**

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

**BACKGROUND**

Plaintiff Dawn Stokes was born December 23, 1967. Tr. 19.[2] She completed high school and earned a regular diploma, but attended separate special education classes during part of the

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 11.

day. Tr. 133, 298, 321, 450. After high school, Stokes worked at various restaurant jobs. Tr.
450-451. Stokes also worked part-time in food preparation from 1989 to 1991 and in home care
from 1999 to 2002. Tr. 120-122. All of Stokes' jobs were brief and she primarily subsisted on
welfare-type benefits until April 2004, when she was hospitalized for mental health concerns and
lost custody of her two children. Tr. 18, 204-209.

On July 22, 2005, Stokes applied for SSI, alleging an onset of disability beginning
January 1, 2000. Tr. 33, 56. Stokes reported learning disabilities and depression as her disabling
conditions. Tr. 128. Stokes' claim was denied initially on December 9, 2005 and upon
reconsideration on March 10, 2006, after which Stokes requested a hearing. Tr. 12, 35, 43. After
the hearing, Administrative Law Judge (ALJ) Lauren R. Mahon issued a decision on September
25, 2007 finding Stokes not disabled. Tr. 12-20. Stokes requested Appeals Council review of
the hearing decision, but her request was denied. Tr. 4-6, 8. Stokes then initiated this action.

I.    **Medical History**

A.    **Childhood**

Stokes and her mother reported that Stokes suffered several serious injuries during her
early childhood. Stokes was apparently born with the umbilical cord wrapped around her neck
and it is believed that she suffered anoxia[3] at birth. Tr. 293, 297. When Stokes was a year and
half old, she fell from a moving car and landed on her head. *Id.* Prior to age three, Stokes had
two eye surgeries. Tr. 293, 297. At age four, Stokes' father apparently threw her violently
against a wall. Tr. 297-98. At five years old, an opthamologist speculated about Stokes possibly

---

[3] Anoxia refers to an absence of oxygen supply to an organ or tissue.

being mentally retarded, stating that her behavior was "'outside the norm.'" Tr. 293. At age 11,

Stokes fell from a fence and split her head open. Tr. 298. Finally, Stokes' adopted father

sexually abused her until her adolescence. Tr. 298.

Stokes also exhibited learning difficulties and was placed in special education. Stokes

reported she started special education in kindergarten, Tr. 271, and that even in high school she

was placed in a resource room for special education services. Tr. 133. Moreover, Stokes stated

that she had learning challenges and described herself as a slow learner. Tr. 299. Stokes' mother

also described her as being slow with reading and comprehending information. Tr. 293, 298.

Finally, the nature of Stokes' own writings, submitted in support of her application for benefits,

hint at her educational challenges.[4]

### B.    Mental Health

Records suggest that Stokes suffered at various times from depression as well as other

psychological impairments. In August 2003, Stokes sought to reestablish care for depression by

refilling her medications, reporting that she started taking antidepressants in 2001. Tr. 287.

Stokes' nurse practitioner diagnosed Stokes with "[d]epression by history." *Id.* In October 2003,

Stokes again sought treatment for depression, reporting that she was agitated and suffering from

insomnia and migraine headaches. Tr. 284. Stokes' nurse practitioner diagnosed Stokes with

"depression" and increased her prescription dosing. Tr. 284.

---

[4] For example, in a disability report submitted in January 2006, Stokes wrote: "Some [sic] my problems are from also getting beet [sic] up somewhere aroud [sic] 4 years ago or so was [sic] hit in the head severail [sic] times back calerbone [sic] also I have head aces [sic] Bad ones my body herts, [sic] at times so bad that I cant move and do anything my mimory [sic] is'it [sic] all that great I some [sic] trouble with it." Tr. 65.

In April 2004, Stokes' mental health conditioned worsened and her mother apparently instigated psychiatric hospitalization.[5]  Tr. 207, 293.  Stokes was admitted to the emergency department of Portland Adventist Medical Center on a physician hold and diagnosed with psychosis and chemical dependence.  Tr. 204-208.  Stokes' doctor entertained the possibility that methamphetamine use contributed to Stokes' psychosis and ordered a drug test, but the urinalysis ultimately revealed no sign of drugs.  Tr. 208.  Stokes was discharged, continued on medications including Lexapro, Risperadal, and Zithromax, and referred to outpatient mental health treatment.  Tr. 205.  In December 2004, Stokes continued seeking mental health treatment for major depression.  Tr. 428.

In February 2006, Stokes again reported struggling with depression and was diagnosed with major depression and amphetamine dependence in remission.  Tr. 316, 320.  On April 25, 2006, Stokes reported to health care providers that her depression was not well controlled.  Tr. 425.  In October 2006 and March 2007, however, Stokes reported her depression as stable.  Tr. 383, 385.  In May 2007, Lesley Upham, a mental health specialist who had worked with Stokes in 2006 and 2007 while Stokes lived in supportive housing, opined that Stokes' depression causes insomnia, low energy, fatigue, low self-esteem, poor concentration, and difficulty making decisions.  Tr. 404.  Upham noted that Stokes' severe symptoms impede her ability to function on a daily basis.  *Id.*  In June 2007, at her hearing before the ALJ, Stokes described that even though medication improved her depression symptoms, she still sleeps during the day and

---

[5] Hospital records suggest several events precipitated Stokes' hospitalization.  In December 2003, Stokes apparently lost her housing and was observed using drugs.  Tr. 273.  Subsequently, the police became involved and removed her two children from her custody.  *Id.*

isolates herself about two or three times per week. Tr. 455-56. Stokes also testified that her

ability to concentrate on a particular task was not good and that she easily becomes distracted.

Tr. 457-58.

    **C.**    **Drug Use**

    Following her hospitalization in April 2004, Stokes admitted that she had a history of

methamphetamine and marijuana use, but reported that she had been clean for the past several

months. Tr. 263. On May 25, 2004, Stokes underwent an alcohol and drug assessment, again

reporting that she had not used drugs since December 2003 and expressing her motivation to stay

clean so that she could regain custody of her children. Tr. 242-43. In a July 2004 psychological

evaluation, Stokes stated that she had been clean for seven months, had previously engaged in

substance abuse treatment, and had been clean for a three-year period sometime in the past. Tr.

300. By July 11, 2005, however, mental health treatment staff voiced doubts about Stokes'

sobriety, noting that her "performance and attendance have fallen off and there is some concern

that she may have reesumed [sic] using drugs." Tr. 233. On August 30, 2005, Stokes' DHS case

worker also suspected that Stokes was using, since she "has had changes in her affect an [sic] has

sores all over her face, arms and legs." *Id.*

    Approximately 16 months later, on April 30, 2007, Stokes entered drug and alcohol

treatment at Cascadia Behavioral Healthcare, reporting that she had been clean for five months

before relapsing once on methamphetamine in March 2007. Tr. 392. At her hearing before the

ALJ on June 25, 2007, Stokes partially confirmed that report, testifying that three months earlier,

in March 2007, she had used methamphetamine once, but was clean for the year prior. Tr. 452.

**D.    Intellectual Functioning**

Stokes' treatment professionals consistently describe her as having compromised intellectual functioning. A psychiatric nurse practitioner referred to her as a "low intellectual functioning client" and commented that Stokes' intelligence "appears below average." Tr. 259, 261. Another clinician noted that she "seems impaired cognitively." Tr. 271.

Licensed psychologists also evaluated Stokes' intellectual functioning three times in 2004 and 2005. Paul Guastadisegni, Ph.D., completed the first evaluation in July 2004 upon a referral from the state Department of Human Services. Tr. 296. Dr. Guastadisegni administered nine standardized tests, including the Weschler Adult Intelligence Scale-III (WAIS-III), commonly known as the IQ test. Tr. 303. Stokes obtained a Verbal IQ score of 64 (first percentile), a Performance IQ score of 74 (sixth percentile), and a Full Scale IQ score of 67 (first percentile). *Id.* Dr. Guastadisegni described Stokes' verbal and full-scale scores as "within the extremely low range" and her performance score as "in the borderline range." *Id.* Because of Stokes' low WAIS-III scores, Dr. Guastadisegni administered another test, whose results were consistent with Stokes' "extremely low" WAIS-III scores. Tr. 304.

Dr. Guastadisegni concluded that Stokes' "IQ test results suggest that she is functioning in the mild range of mental retardation." Tr. 306. Dr. Guastadisegni, however, preferred not to diagnose Stokes with mental retardation unless "there is documented proof from her childhood that would place her in this range." *Id.* Dr. Guastadisegni explained that individuals do not develop mental retardation as adults and suggested that IQ testing records from Stokes' childhood likely could be obtained from her special education services or from her mother. *Id.*

Among other factors such as anoxia at birth and head trauma in childhood, Dr. Guastadisegni noted that Stokes "has abused marijuana and methampehtamine, which might have further contributed to cognitive decline." *Id.* Dr. Guastadisegni also emphasized the impacts of Stokes's low level of cognitive functioning: "[s]he does not cope well, is easily confused, and sometimes might misperceive things due to her cognitive limitations." Tr. 307. Finally, Dr. Guastadisegni diagnosed Stokes with "[b]orderline intellectual functioning, rule out mild mental retardation," among other conditions. *Id.*

In May 2005, Stokes was referred for an intellectual and adaptive assessment to determine whether she qualified for Clackamas County developmental disability services under the classification of mental retardation. Tr. 293. Bruce Boyd, Ph.D., a licensed psychologist, retested Stokes and determined that she had a Full Scale IQ of 66, a Verbal IQ of 72, and a Nonverbal IQ of 62.[6] Tr. 294. Dr. Boyd determined that Stokes was not responding impulsively and that there was no suggestion of a fatigue effect to depress performance later in the testing session; he therefore considered the test results valid. *Id.*

Based on the IQ test and other assessments, Dr. Boyd concluded that Stokes' intellectual functioning was "in the mild range of impairment." Tr. 295. Like Dr. Guastadisegni, Dr. Boyd acknowledged that a diagnosis of mental retardation requires testing prior to age 18 showing intellectual deficits and that there was no record of such testing with Stokes. Dr. Boyd also recognized that drug use might have affected Stokes' intellectual testing, noting that "[i]t cannot

---

[6] Because retesting Stokes on the WAIS-III within a year could have yielded an inflated score due to the "practice effect," Dr. Boyd employed a different test to measure IQ, the Stanford Binet Intelligence Scales. Tr. 294.

Page 11 - FINDINGS AND RECOMMENDATION

be unequivocally ruled out that recent substance abuse did not lower her current IQ scores." *Id.*
Dr. Boyd, however, reasoned that since Stokes was in special education as a child, "it seems
likely that the current scores reflect her level in childhood." *Id.* Consequently, Dr. Boyd opined
that "a diagnosis of Mild Mental retardation is warranted." *Id.* Subsequently, on May 11, 2005,
Clackamas County Mental Health designated Stokes as eligible for services as a person with
mental retardation, checking a form indicating that Stokes' "IQ pattern [was] established by the
18th birthday." Tr. 234 (without explaining the reasoning behind that designation).

In November 2005, Stokes was referred to Duane Kolilis, Ph.D. for a pyschodiagnostic
evaluation to assist the Social Security Disability Determination Services in assessing her
eligibility for benefits. Tr. 180. Unlike Dr. Guastadisegni and Dr. Boyd, Dr. Kolilis did not
perform IQ testing, instead limiting his assessment to a clinical interview and records review. Tr.
180-84. Dr. Kolilis hypothesized that Stokes' psychotic symptoms evident during her
hospitalization in 2004 "may have been due to <u>withdrawal</u>," since Stokes had no other
documented history of delusional thinking. Tr. 183-84 (emphasis in original). Dr. Kolilis also
disagreed with the prior psychologists' assessments of Stokes' intellectual functioning,
estimating that Stokes was "functioning in the Average Range of intellectual abilities" and
opining that when Stokes was clean and sober she was capable of "understanding, remembering,
and following at least simple one- to two-step instructions; sustaining concentration and
attention, persisting in work-related activities, adapting to changes in routine, and engaging in
appropriate social interactions." Tr. 184. Dr. Kolilis found insufficient evidence of either
learning disorders or depression – Stokes' allegedly disabling conditions – and opined that if
Stokes received financial assistance from Social Security, "she would not be able to manage her

Page 12 - FINDINGS AND RECOMMENDATION

money in a responsible manner due to temptations from substance abuse." *Id.* Consequently, Dr. Kolilis diagnosed Stokes with polysubstance dependence and suggested that malingering and substance-induced psychotic disorder (with onset during withdrawal) should be ruled out. *Id.*

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found in his September 13, 2009, opinion that Stokes did not engage in substantial gainful activity since July 22, 2005, her application date. Tr. 14. He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Stokes' medical impairments of "mood disorder; borderline intellectual functioning; history of drug and alcohol abuse (7/22/2005 – 3/1/2006)" were "severe" for purposes of the Act. Tr. 14. Because the combination of impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Stokes's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 14. Stokes disputes this conclusion.

Next, the ALJ conducted an assessment of Stokes' residual functional capacity. Specifically, the ALJ found that Stokes could:

> perform a full range of work at all exertional level but with the following
> nonexertional limitations: limited to simple routine work tasks; is capable of
> interacting with others in the course of performing simple work; and is capable of
> adapting to normal changes in a work setting.

Tr. 17.

Page 13 - FINDINGS AND RECOMMENDATION

At the fourth step, the ALJ that Stokes' had no past relevant work.  Tr. 18.

At the fifth step, the ALJ found in light of Stokes' age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that she could perform.  Tr. 19.  The ALJ found that Stokes' nonexertional limitations have little or no effect on her ability to perform unskilled work at all exertional levels.  *Id.*  Therefore, the ALJ concluded that Stokes was not disabled as defined in the Act since July 22, 2005.  *Id.*

## ANALYSIS

Stokes argues that the Commissioner erred when he: (1) improperly found that she did not meet the Social Security Listing 12.05C for mental retardation; (2) improperly evaluated her residual functional capacity; and (3) improperly considered lay witness evidence.  Because the first issue is dispositive, this court need not discuss the two remaining issues.

I.      **Listing 12.05C**

The Social Security Regulations' "Listing of Impairments" describes impairments that are so severe as to be considered presumptively disabling, without further consideration of a claimant's residual functional capacity, past relevant work, or other jobs.  20 C.F.R. §§ 404.1520(d), 416.920(d); *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990).  Listing 12.05C for Mental Retardation provides:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairments before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

Page 14 - FINDINGS AND RECOMMENDATION

. . . .

    C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.C.  In order to meet or equal Listing 12.05C,

the claimant must show three things: (1) a valid verbal, performance, or full scale IQ of 60

through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental

impairment imposing an additional and significant work-related limitation of function.[7]  *Maresh*

*v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006); *see Edmond v. Astrue*, No. CIV S-07-1660 EFB,

2009 U.S. Dist. LEXIS 30040, at *38 (E.D. Cal. Mar. 30, 2009).

    The ALJ found that Stokes did not meet Listing 12.05C for several reasons, although he

did not clarify which of the three requirements of Listing 12.05C Stokes failed to satisfy.  The

ALJ reasoned:

> The records reflect that claimant has performance IQ scores consistent with borderline intellectual functioning.  There was also a suggestion that her recent drug and alcohol abuse could have lowered her IQ test results.  It is not clear that the low scores were completely reliable.  The impression of several examining psychologists ranged from the opinion that claimant had borderline intellectual functioning to the impression that she had average intelligence.

Tr. 16.  The Commissioner argues that each of these conclusions are supported by substantial

evidence in the record and are free of legal error.  I disagree.

-------------------

    [7] Much of the case law concerning Listing 12.05C refers to two, as opposed to three, separate requirements: the severity criteria and the diagnostic criteria. *See, e.g.*, *Randall v. Astrue*, 570 F.3d 651, 658 (5th Cir. 2009) (holding that "every mental disorder listing includes two independent components: a diagnostic description of the disorder and specific criteria measuring the disorder's severity.") Since the severity criteria, however, is described as having two prongs, I prefer to use the more straighforward three-requirement formulation from *Maresh v. Barnhart*.

Page 15 - FINDINGS AND RECOMMENDATION

A.    **IQ Scores**

An ALJ clearly possesses the power to reject a claimant's IQ scores if they are invalid. *See* 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.C (requiring a "valid" IQ score to meet the Listing); *Thresher v. Astrue*, 283 Fed. Appx. 473, 475 (9th Cir. 2008) ("We do not doubt that an ALJ can decide that an IQ score is invalid.") Although the Ninth Circuit has never decided what factors an ALJ may use to determine an IQ score's validity, decisions from other courts indicate the ALJ may rely on external evidence of a score's invalidity, such as improper testing conditions or a claimant's participation in activities inconsistent with the IQ score. *See Thresher*, 283 Fed. Appx. at 475 n. 6 (citing cases). However, if the ALJ fails to explicitly reject the validity of a claimant's IQ scores, he may not otherwise reject those scores without substantial evidence for doing so. *Lewis v. Astrue*, No. C 06-6608 SI, 2008 U.S. Dist. LEXIS 6108, at *11 (N.D. Cal. Jan. 22, 2008) ("the ALJ did not explicitly reject the validity of claimant's new IQ score, so the Court must accept the score as valid"); *Applestein-Chakiris v. Astrue*, No. 09cv00009 BTM(WMc), 2009 U.S. Dist. LEXIS 68762, at *23 (S.D. Cal. Aug. 5, 2009) (although an ALJ may question the validity of an IQ score, he may not otherwise reject an IQ score without substantial evidence).

Here, the ALJ improperly rejected Stokes' IQ scores because he never explicitly commented on their validity. Although the ALJ noted that "[i]t is not clear that the low scores were completely reliable", Tr. 16, that statement apparently refers not to the validity of the test results themselves, but to the possibility that Stokes' adult drug use lowered her intellectual capacity, and consequently, her IQ scores. Moreover, even assuming without deciding that the

ALJ's statement was an explicit finding that Stokes' IQ scores were invalid,[8] that conclusion would not have been based on substantial evidence in the record. Dr. Guastadisegni and Dr. Boyd arrived at similar IQ scores using different instruments. Dr. Guastadisegni even confirmed Stokes' IQ scores on the WAIS-III testing using another cognitive assessment. Further, Dr. Boyd specifically evaluated Stokes' responses to the testing conditions and determined that Stokes' scores were valid. There is also no evidence in the record of Stokes engaging in activities inconsistent with her IQ scores. Finally, even if the ALJ had properly found the IQ scores invalid, the ALJ failed to carry out his duty to assist in developing the factual record, including potentially ordering a new mental examination. *See Reed v. Massanari*, 270 F.3d 838, 841 (9th Cir. 2001).

Additionally, the ALJ erred by suggesting that Stokes does not meet the first requirement of Listing 12.05C because "examining psychologists" described Stokes as having either borderline or average intellectual functioning.[9] Case law from the Eighth Circuit and decisions from district courts in the Ninth Circuit, including this court, all hold that the first requirement of the listing is satisfied purely by a claimant's IQ scores, irrespective of the particular language

---

[8] The Ninth Circuit cautions against such speculation about the basis of an ALJ's conclusions, particularly if the "opinion indicates that the conclusion may have been based exclusively upon an improper reason." *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990).

[9] Significantly, only Dr. Guastadisegni and Dr. Boyd actually evaluated Stokes' intellectual functioning using objective instruments, both of whom generally agreed that Stokes' intelligence was borderline at best. Thus, to the extent that the ALJ rejected the assessments of Dr. Guastadisegni and Dr. Boyd in favor of Dr. Kolilis' estimate that Stokes possessed average intellectual capacities, he erred by failing to give specific and legitimate reasons for dismissing their opinions. *See Lester v. Chater*, 81 F.3d 821, 830-831 (9th Cir. 1995).

used to describe the claimant's mental status. *See Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006) ("this court disagrees with the Commissioner that the Listing's introductory paragraph requires a formal diagnosis of mental retardation"); *Garrett v. Astrue*, No. EDCV 07-549-MAN, 2008 U.S. Dist. LEXIS 78510, at *16-17 n.7 (C.D. Cal. Sept. 19, 2008) (plaintiff's IQ score "satisfies the first requirement of Listing 12.05C regardless of any language in his opinion diagnosing or otherwise describing Plaintiff's mental status"); *Lewis*, 2008 U.S. Dist. LEXIS 6108, at *5 (finding that a verbal IQ score of 68 satisfies the first requirement of Listing 12.05C, even when the doctor performing the IQ tests had diagnosed claimant with "'borderline intellectual functioning and not mental retardation'"); *Phelps v. Barnhart*, No. CV 04-1657-PK, #40, slip op. at 9 (D. Or. Dec. 20, 2006) (Papak, Mag. J.) ("A formal diagnosis of 'mental retardation' is not required"). Thus, the various labels that psychologists use to describe Stokes' intellectual capacity are not particularly relevant. Since Stokes has received several IQ scores below 70, she satisfies the first requirement of Listing 12.05C.

### B.    Onset Before Age 22

The second requirement of Listing 12.05 is an onset of "significantly subaverage general intellectual functioning with deficits in adaptive functioning" before age 22. 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.C. Again, while the ALJ's reasoning is not completely clear, his decision implies that Stokes' relatively recent IQ test scores do not reflect her intellectual functioning as a youth because her drug and alcohol use in the intervening years could have diminished her cognitive capacity. Although some courts credit low IQ scores after age twenty-two as presumptively satisfying the second requirement of the listing, *see, e.g., Maresh*, 438 F.3d at 900, it is still an open question whether the Ninth Circuit has adopted that

presumption. *Hartman v. Astrue*, 2008 U.S. Dist. LEXIS 92548, at *44 (W.D.Wash. Aug. 29, 2008). Whether or not the presumption applies, the reviewing court's task is similar: to determine whether the ALJ's finding that the claimant's mental impairment did not manifest prior to age 22 is supported by substantial evidence. *Id.*

Here, the ALJ's determination implying that Stokes' mental impairment began after age 22 was not supported by substantial evidence. The extent of the evidence in the record supporting ALJ's conclusion is exactly as the ALJ described it: a mere "*suggestion* that [Stokes'] recent drug and alcohol abuse could have lowered her IQ test results." Tr. 16 (emphasis added). Dr. Guastadisegni noted that Stokes "has abused marijuana and methamphetamine, which might have further contributed to cognitive decline," Tr. 306, and Dr. Boyd wrote that "[i]t cannot be unequivocally ruled out that recent substance abuse did not lower her current IQ scores." Tr. 295. Although the evaluating psychologists include these two caveats concerning the possible effect of Stokes' recent drug use on her IQ scores, their conclusions tend to disregard that possibility. Dr. Guastadisegni stopped short of diagnosing mental retardation because Stokes lacked documentation of childhood IQ scores, but observed that "one does not develop mental retardation as an adult." Tr. 306. Although Dr. Boyd similarly noted that a diagnosis of mental retardation requires intellectual testing before age 18, he opined that "it seems likely that the current scores reflect [Stokes'] level in childhood" and thus found a mild mental retardation diagnosis to be appropriate. Tr. 295.

In contrast, there is significant evidence indicating that Stokes' intellectual impairment originated in childhood. Stokes suffered several distinct childhood injuries involving her head, and an opthamologist raised the possibility that she suffered from mental retardation at age 5.

Page 19 - FINDINGS AND RECOMMENDATION

Stokes was placed in special education from the beginning of her schooling at age 6 and remained there through high school. *See Bee Thao v. Astrue*, No.CIV S-07-1486 EFB, 2009 U.S. Dist. LEXIS 26968, at *28 (E.D. Cal. Mar. 30, 2009) (whether plaintiff was placed in special education is "highly significant" to the question of whether plaintiff meets Listing 12.05C).  Both Stokes and her mother described Stokes' difficulties in learning and comprehending information. Finally, Clackamas County determined that Stokes was eligible for developmental disability-related services based an IQ pattern established by age 18.  As this court observed in a very similar case, "the record contains evidence that [claimant] struggled with intellectual functioning from an early age." *Phelps*, No. CV 04-1657-PK, #40, slip op. at 12.  In sum, a reasonable person would not accept the psychologists' brief speculation about the effects of Stokes' drug use as adequate evidence that her intellectual impairment began later in life, especially considering Stokes' history of brain trauma and sustained placement in special education. *See Lingenfelter*, 504 F.3d at 1035 (defining substantial evidence as "relevant evidence as a reasonable person might accept as adequate to support a conclusion.")  Thus, to the extent that the ALJ determined that Stokes did not satisfy the second requirement of Listing 12.05C, his decision was not supported by substantial evidence.

### C.    Impairment Imposing an Additional and Significant Work-Related Limitation

In order to satisfy the last requirement of Listing 12.05C, a claimant must show "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.C.  The Ninth Circuit has held that an impairment imposes a "significant work related limitation of function" when its

effect on a claimant's ability to perform basic work activities is "more than slight or minimal."

*Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1987). If an ALJ finds an impairment to be

"severe" in Step Two of the disability analysis, that impairment necessarily has more than a

slight or minimal effect on claimant's ability to perform basic work activities. *Garrett*, 2008

U.S. Dist. LEXIS 78510, at *18 (also noting that numerous other circuits deem an ALJ's finding

of an additional severe impairment to satisfy the last requirement of Listing 12.05C); S.S.R. No.

96-8p, 1996 SSR LEXIS 5, *4 (a severe impairment has more than a minimal effect on a

claimant's ability to do work); *cf. Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (an

impairment is not severe if it does not significantly limit claimant's ability to do basic work

activities).

Here, the ALJ found that Stokes had two "severe" impairments in addition to her

cognitive limitations: a mood disorder and a history of drug and alcohol abuse.[10] Tr. 14. That

finding alone satisfies the final requirement of Listing 12.05C. Moreover, between August 2005

and April 2007, Stokes' mental health professionals consistently evaluated Stokes' Global

Assessment of Functioning (GAF) in the ranges indicating either serious or moderate symptoms,

with the exception of Dr. Kolilis, who gave Stokes a GAF score indicative of only transient

symptoms. Tr. 14-15, 184, 307, 320, 346. This additional evidence also suggests that Stokes'

other impairments significantly limited her ability to work. Thus, the ALJ erred to the extent that

---

[10] Although the ALJ determined that Stokes' history of drug and alcohol abuse did not
interfere with her ability to work for more than 12 months, Tr. 15, he made no such finding
concerning Stokes' mood disorder (depression), which apparently affected Stokes since at least
2001, when she began taking anti-depressant medication.

he found Stokes failed to satisfy the final requirement of Listing 12.05C.

## CONCLUSION

For the reasons set forth above, this court finds that Stokes meets or equals Listing 12.05C and is therefore disabled as of July 22, 2005, her application date. I recommend that the Commissioner's final decision be reversed and remanded for a calculation and award of benefits. A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 4th day of January, 2011.

Honorable Paul Papak
United States Magistrate Judge